# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

LUNDY L. NEELY,

        Plaintiff,             :        Case No. 3:13-cv-00109

                                          District Judge Walter H. Rice

      -vs-                        Magistrate Judge Michael R. Merz

                                :

CROWN SOLUTIONS CO., LLC., et al.,

        Defendants.

---

# REPORT AND RECOMMENDATIONS ON DEFENDANTS' MOTION TO DISMISS

---

      Before the Court is Defendants' Motion to Dismiss (Doc. No. 2). Plaintiff filed a Memorandum in Opposition (Doc. No. 10) and Defendant filed a Reply (Doc. No. 12).

      This case was referred to a magistrate judge on June 19, 2013, and was transferred to Magistrate Judge Michael R. Merz on June 20, 2013. (Preliminary Pretrial Order, Doc. No. 14); (Transfer, Doc. No. 15). Motions to dismiss involuntarily are classified as dispositive under 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72, requiring a recommended disposition from a Magistrate Judge to whom they are referred.

      As of March 11, 2013, the time of the filing of the Complaint in the Montgomery County Common Pleas Court, Plaintiff Neely was a resident of the State of Ohio. Defendant Crown Solutions Co., LLC, whose sole member is Veolia Water Solutions and Technologies North America, Inc., is incorporated in Delaware and maintains its principal place of business in Pennsylvania. (Notice of Removal, Doc. No. 1, PageID 2.)  Defendants removed the case to this

Court based on diversity of citizenship jurisdiction. 28 U.S.C. §§ 1441(a) and (b) and 1332. *Id.* at ¶ 4

In a diversity action, the district court is obliged to apply the choice of law rules of the State in which it sits. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 491 (1941); *Boyd v. LaMaster,* 927 F.2d 237 (6th Cir. 1991); *Macurdy v. Sikov & Love, P.A.,* 894 F.2d 818 (6th Cir. 1990). The Supreme Court of Ohio has adopted the Restatement of Law (Second), Conflict of Laws, Section 187 in applying the choice of law provisions in contracts. *Transp. Ins. Co. v. Busy Beaver Bldg. Ctrs., Inc.,* 2013 U.S. Dist. LEXIS 121838 at *13-14 (S.D. Ohio 2013), *citing Schulke Radio Productions, Ltd. v. Midwestern Broad. Co.*, 6 Ohio St. 3d 436 (1983). In the event of a dispute as to which law governs, the Court should consider the elements as set forth in Section 188 of the Restatement to determine which law to apply. The Court should consider 1) the place of contracting; 2) the place of negotiation; 3) the place of performance; 4) the location of the subject matter; and 5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.*, *citing Ohayon v. Safeco Ins. Co. of Ill.*, 91 Ohio St. 3d 474 (2001). The law of the State with the "most significant relationship" to both the parties and transition should be applied. *Id.*, *citing* Restatement (Second) of Conflict of Laws § 188.

Here the parties expressly agreed in the Employment Agreement that disputes arising from the Agreement would be governed by Delaware law, "[t]his Agreement shall be construed in accordance with and governed by the laws of the State of Delaware . . ." (Complaint, Doc. No. 1-2, PageID 111); (Motion to Dismiss, Doc. No. 2-1, PageID 141). The parties do not contest that choice of law should be honored and Delaware law applied to the claims that deal directly with the rights contained within Employment Agreement.

A federal court exercising diversity subject matter jurisdiction over state law claims must apply state substantive law to those claims.  28 U.S.C. § 1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). In applying state law, the Sixth Circuit follows the law of the State as announced by that State's supreme court. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008); *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992); *Miles v. Kohli & Kaliher Assocs.,* 917 F.2d 235, 241 (6th Cir. 1990). "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Id.; In re Akron-Cleveland Auto Rental,  Inc.,* 921 F.2d 659, 662 (6th Cir. 1990); *Bailey v. V & O Press Co*., 770 F.2d 601 (6th  Cir. 1985); *Angelotta v. American Broadcasting Corp.,* 820 F.2d 806 (1987).  The available sources to be considered if the highest court has not spoken include relevant dicta from the state supreme court, decisional law of appellate courts, restatements of law, law review commentaries, and the "majority rule" among other States.  *Bailey*, 770 F.2d at 604. "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th  Cir.1989); *accord Northland Ins. Co. v. Guardsman Products, Inc*., 141 F.3d 612, 617 (6th  Cir.1998); *Melson v. Prime Ins. Syndicate, Inc.*, 429 F. 3d 633, 636 (6th Cir. 2005). This rule applies regardless of whether the appellate court decision is published or unpublished. *See Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 328 (6th  Cir. 2000); *Puckett,* 889 F.2d at 1485.  *Ziegler v. IBP Hog Market*, 249 F.3d 509, 517 (6th  Cir. 2001).

Respondent's Motion is made under Fed. R. Civ. P. 12(b)(6).  "The purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; it is

not a procedure for resolving a contest about the facts or merits of the case." Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: Civil 2d § 1356 at 294 (1990); *see also Gex v. Toys "R" Us*, 2007 U.S. Dist. LEXIS 73495, *3-5 (S.D. Ohio, Oct. 2, 2007); *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993), *citing Nishiyama v. Dickson County, Tennessee*, 814 F.2d 277, 279 (6th Cir. 1987). Stated differently, a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is designed to test, whether as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. *Mayer*, 988 F.2d at 638, *citing Nishiyama*, 814 F.2d at 279.

The test for dismissal under Fed. R. Civ. P. 12(b)(6) has recently been re-stated by the Supreme Court:

> Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004)("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)(" Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

> [W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co.*, 114 F. Supp. 643, 645 (D. Hawaii 1953) ); see also Dura [*Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)], at 346, 125 S.Ct. 1627, 161 L. Ed. 2d 577; *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc* ., 289

4

> F. Supp. 2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation)
> ("[S]ome threshold of plausibility must be crossed at the outset before a
> patent antitrust case should be permitted to go into its inevitably costly
> and protracted discovery phase").

*Twombly*, 550 U.S. at 558 (*overruling Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), specifically

disapproving of the proposition that "a complaint should not be dismissed for failure to state a

claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief"); *see also Association of Cleveland Fire Fighters v. City

of Cleveland, Ohio,* 502 F.3d 545 (6th Cir. 2007).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Supreme Court made it clear that

*Twombly* applies in all areas of federal law and not just in the antitrust context in which it was

announced. Following *Iqbal*, district courts faced with motions to dismiss must first accept as

true all of the factual allegations contained in a complaint.  This requirement "is inapplicable to

legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Twombly*, 550 U.S. at 555. Second, only a complaint that

states a plausible claim for relief survives a motion to dismiss. *Id*. at 556.  Under *Iqbal*, a civil

complaint will only survive a motion to dismiss if it "contain[s] sufficient factual matter,

accepted as true, to state a claim for relief that is plausible on its face. . . . Exactly how

implausible is "implausible" remains to be seen, as a malleable standard will have to be worked

out in practice." *Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 629-30 (6th Cir.

2009). Applying the *Twombly/Iqbal* standard, Judge Rice has written:

> [O]n the plausibility issue, the factual allegations in the complaint
> need to be sufficient "to give notice to the defendant as to what
> claims are alleged, and the plaintiff must plead 'sufficient factual
> matter' to render the legal claim plausible, i.e., more than merely
> possible." *Fritz v. Charter Twp. Of Comstock*, 592 F.3d 718, 722
> (6th Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1949-50). Further, "a
> legal conclusion [may not be] couched as a factual allegation" and

mere "recitations of the elements of a cause of action" are insufficient to withstand a motion to dismiss. *Id.* (quoting *Hensley v. Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009)).

*White v. Chase Bank USA, NA*, 2010 U.S. Dist. LEXIS 102908 (S.D. Ohio 2010), as cited in *General Truck Drivers, Warehousemen, Helpers Sales & Serv., & Casino Emples., Teamsters Local Union No. 957 v. Heidelberg Distrib. Co.*, 2012 U.S. Dist. LEXIS 68996 at 6 (S.D. Ohio 2012); *B&P Company, Inc. v. TLK Fusion Entertainment, LLC*, 2013 U.S. Dist. LEXIS 26131 at 6 (S.D. Ohio 2013).

The Sixth Circuit has also recently held that to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," *Savoie v. Martin*, 673 F.3d 488 (6th Cir. 2012), *quoting Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dept. of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (207), and that "[a]ll well-pled facts in the complaint must be accepted as true." *Savoie*, *supra*, *citing Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009), *citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ANALYSIS

In considering the 12(b)(6) motion, the Court turns to the factual allegations contained in the Complaint, which for the purposes of this Motion, the Court accepts as true.

Plaintiff Neely's Complaint arises out of his prior employment with Crown Solutions Co., LLC, and their termination of his employment in February 2013.  Neely founded Crown Solutions in Vandalia, Ohio. In 2006, however, he sold the majority of his interest in the company to Veolia France (now known as Veolia Water Solutions and Technologies North America, Inc. or "VWS&TNA").  As part of this transaction, it was agreed that Neely would continue to serve as the President and CEO of Crown Solutions.   Plaintiff, as well as the other

individual shareholders, entered into an Operating Agreement with VWS&TNA that granted them the right to sell back, and required VWS&TNA to purchase, their remaining membership interests in Crown Solutions. The purchase price for these shares was to be calculated through a formula set forth in the Operating Agreement. (Complaint, Doc. No. 1-1, PageID 6-15.)

In addition to the Operating Aagreement, Neely and VWS&TNA entered into an Employment Agreement. The terms of this agreement expressly stated that the conditions were to remain in effect for three years. The parties also entered into a separate Assignment Agreement, in which VWS&TNA stated that Crown Solutions would honor all obligations as set forth in the Employment Agreement. *Id*.

In October of 2012, Mr. Neely, as well as the other individual shareholders, exercised their rights to sell their remaining membership interests in Crown Solutions. VWS&TNA responded with an offered purchase price which the shareholders deemed low. The parties negotiated and on December 31, 2012, VWS&TNA and the shareholders, with the exception of Neely, reached a settlement on purchase price. Neely reached an interim agreement in which he would be paid the settled upon amount and then go to arbitration for the remainder, as was outlined in the terms of the Operating Agreement, to resolve the outstanding dispute and amount. *Id*.

Neely was terminated from his position at Crown Solutions on February 13, 2013, effective on February 15, 2013. (Complaint, Doc. No. 1-1, PageID 50.) He was advised that he would not receive any additional compensation in the form of severance pay or benefits. *Id*. That same day he was also notified that he was "removed" from the Board. *Id*. at PageID 51. He notes that none of the remaining individual shareholders were removed from their positions on the Board, nor was their employment terminated.

In his Complaint, Plaintiff Neely raises the following claims:

1. Count I Wrongful Termination against Defendant Crown Solutions
2. Count II Anticipatory Breach of Contract against Defendant Crown Solutions
3. Count III Breach of Contract against Defendant Crown Solutions
4. Count IV Breach of the Implied Covenant of Good Faith and Fair Dealing against Defendant Crown Solutions
5. Count V Indemnification and Hold Harmless against Defendant VWS&TNA
6. Count VI Tortious Interference with Contract against Defendant VWS&TNA
7. Count VII Tortious Interference with Prospective Economic Advantage against Defendant VWS&TNA
8. Count VIII Declaratory Judgment against Defendant Crown Solutions

(Doc. No. 1-1.)

<u>Count I</u>

In his first count, Neely alleges wrongful termination. (Complaint, Doc. No. 1-1, PageID 15.) He concedes that he was an at-will employee and the Employment Agreement permitted Crown Solutions to terminate his employment with or without cause pursuant to the Termination Conditions of that Agreement. *Id.* He argues, however, that his termination was contrary to Ohio's public policy prohibiting termination of employees for consulting with legal counsel in regards to their legal rights with their employer. *Id.* This policy is grounded on federal and state statutes, the Constitution, and common law.

Neely asserts that his termination was a result of retaliation against him for consulting counsel, initiating arbitration against his employer, and for objecting at a Board meeting to the certification of false financial information. (Complaint, Doc. No. 1-1 PageID 15-16.) He argues that Crown Solutions' wrongful acts and practices were willful and malicious and done in complete disregard for Neely's legal and contractual rights. As a direct and proximate result of these actions, he claims he has been injured and is entitled to damages. *Id.* at PageID 16.

8

He states that he has clearly alleged facts demonstrating that his termination contravened a "clear public policy." (Answer, Doc. No. 10, PageID 182.) As outlined by the Ohio Supreme Court in *Kulch v. Structural Fibers, Inc.*, the necessary elements to state a claim for wrongful discharge in violation of public policy are:

> (1) That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation or in the common law (the clarity element);
>
> (2) That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element);
>
> (3) The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and
>
> (4) The employer lacked overriding business justification for the dismissal (the overriding justification element).

78 Ohio St. 3d 134, 151 (1997); *Collins v. Rizkana*, 73 Ohio St. 3d 65 (1995).  Neely notes Defendants' concession that Ohio law recognizes a wrongful termination as a matter of public policy, where an employee is terminated for consulting with an attorney, especially in situationswhere the employee seeks this consultation regarding violations of his rights as an employee. (Answer, Doc. No. 10, PageID 182), *citing Chapman v. Adia Servs., Inc.*, 116 Ohio App. 3d 534 (1997). This right extends to retaliatory termination when the employee initiates legal proceedings. *Id*. at 183.  He reiterates that he was terminated in whole or part because Crown Solutions wanted to "retaliate against him for exercising his right to consult an attorney and pursue appropriate legal proceedings . . . after rejecting the Buyer Put Price Calculation." *Id*. He further states that his duel relationship with Crown Solutions as employee/employer and seller/buyer further implicates Ohio's public policy under *Moskowitz v. Progressive Ins. Co.*, 128 Ohio Misc. 2d 10 (Lake County, 2004). *Id*.  Additionally he argues that the Employment Agreement expressly referenced the Operating Agreement and that he had initiated the dispute

9

resolution procedure as outlined in the Operating Agreement in an attempt to resolve the outstanding Put Purchase Price Dispute. *Id*. Therefore he has demonstrated that he was terminated without cause whatsoever, but rather for consulting with an attorney regarding his rights as an employee, for following the outline in the Operating Agreement as to dispute resolution, and for objecting to unverified and inaccurate financial information. *Id*. at 184. As for the final prong of necessary elements, he again reiterates that he had fully performed his duties under the Employment Agreement and Crown Solutions did not have an overriding legitimate business interest to justify this termination. *Id*.

In support of their Rule 12(b)(6) Motion to Dismiss, Defendants argue that Plaintiff's claim fails because an employee *can be* terminated for bringing an action against his employer and for consulting with an attorney regarding a personal business interest. (Motion to Dismiss, Doc. No. 2-1, PageID 138)(emphasis added.) There is no dispute between the parties as to the at-will status of Mr. Neely's employment. Likewise, Defendants agree that Ohio courts do recognize an exception to the employment-at-will doctrine where the termination is contrary to clear public policy, such as an employee's being terminated solely for consulting with an attorney regarding his rights as an employee. *Id*., *citing Greeley v. Miami Valley Maint. Contractors*, 49 Ohio St. 3d 228 (1990); *Simonelli v. Anderson Concrete Co.*, 99 Ohio App. 3d 254 (1994). Defendants argue however, that no such policy was implicated here. *Id*. Ohio courts have imposed limits on the public policy exception, holding that "there is no public policy violation when an employer terminates an employee for consulting and/or retaining an attorney with regard to the employee's own business interests," such as the case here. *Id*. at PageID 138-139, *citing Popp v. Intergrated Elec. Servs.*, 2005 Ohio 5367, 2005 Ohio App. LEXIS 4876 at *10-11 (12th Dist. Ct. App. 2005.) Additionally, Defendants note that Ohio courts have not

10

recognized a public policy in favor of permitting an employee to file suit against his employer when the initiated legal proceeding against the employer does not involve an issue related to the employee's employment rights. *Id*. at PageID 139.  In fact, when given the opportunity "the court issuing *Chapman* was asked 'to extend the *Chapman* rule and hold that there is a clear public policy in favor of permitting an employee to file suit against his employer,' it 'decline[d] to do so.'" (Reply, Doc. No. 12, PageID 208), *citing Elam v. Carcorp, Inc.*, 2013 Ohio App. LEXIS 1523 at *10 (Ohio Ct. App. Apr. 23, 2013), *citing Taylor v. Volunteers of America*, 153 Ohio App. 3d 698, 702 (1st Dist. 2003).

As additional support for their Motion to Dismiss, Defendants point to Neely's own argument that he was terminated for consulting an attorney regarding the Put Price Calculation Dispute.  This consultation was for the purposes of initiating legal proceedings, arbitration, against VWS&TNA to determine the amount owed to him for his sale of shares under the Operation Agreement. These actions all stemmed from Neely's position as a shareholder, not as an employee. Thus his employee rights were not implicated and cannot be protected under the public policy exception. *Id*. at PageID 140.  His additional argument that he was punished for his conduct at a Board meeting likewise fails. (Motion to Dismiss, Doc. No. 2-1, PageID 139-140.)  He objected to the Board's "acceptance of unverified financial information about Crown Solution's performance, 'which had been presented to support the erroneous Buyer Put Price Calculation position in the upcoming arbitration.'" *Id*. at 140, *quoting* Complaint, Doc. No. 1-2 at 80-81.  These actions all relate to Neely's personal business interests with the company, not his rights as an employee. As a result, none of these actions are protected under the public policy exception. *Id*. at 140.

Construing the Complaint in the light most favorably to the Plaintiff and accepting its allegations as true, the Magistrate Judge recommends that the 12(b)(6) motion on this claim be denied. Under Ohio law, as set forth in *Chapman*, when an employer terminates an employee for consulting an attorney regarding his rights as an employee, there is a violation of public policy. *Chapman v. Adia Services, Inc.*, 116 Ohio App.3d 534 (1997). In finding this public policy, the court relied on Article I, Section 16, of the Ohio Constitution (requires all courts be open for redress of a citizen's injury), Ethical Considerations 1-1 and 2-1 of the Ohio Code of Professional Responsibility (all persons should have ready access to legal representation), and common law (recognizing the need for legal representations for the redress of wrongs.) *Id.* at 542-43; see also *Popp v. Integrated Elec. Services,* 2005 Ohio 5367, 2005 Ohio App. LEXIS 4876 at *8 (recognizing the holding in *Chapman* but declining to extend it to situations where an employee seeks legal counsel with regard to employee's own business interests, as opposed to his employee rights.)

Drawing all reasonable inferences in favor of the Plaintiff as the Court is required to do in a 12(b)(6), due to the intertwining relationship in Neely's role of shareholder/Board member and employee, it is difficult to perhaps see where one role ended and the other began. For example, the Employment Agreement itself listed Neely's job duties as:

> The Company hereby employs Executive to serve as president of the company…..
> Executive shall report directly to the Company's Board of Managers (the Board), shall be responsible for the day-to- day management and supervision of the operations of the Company and shall perform such executive, managerial, administrative and financial functions as are required so to manage and supervise such operations, and shall have such other duties and authorities as may otherwise be assigned to Executive by the Board, in all cases subject to the limitations contained in the Operating Agreement of the Company as in effect on the date hereof, as the same may be

12

> amended or otherwise modified from time to time (the "Operating
> Agreement.") Executive shall comply with all policies and
> procedures of the Company as may be adopted from time to time
> and with the applicable provisions of the Operating Agreement. . . .

(Complaint, Doc. No. 1-1, PageID 27.) Defendants defined the Employment Agreement as relating solely to Neely's rights as an employee, while defining the Operating Agreement as relating to Neely's rights as a shareholder.  However, as seen from the above paragraphs, the agreements are specifically cross-referenced in their roles. Additionally, the job description of "executive shall report directly to the Company's Board . . . and shall be responsible for the day to day management and supervision of the operations . . .and shall perform such . . .financial functions as required to manage and supervise such operations…" puts into question whether Neely's conduct at the Board meeting regarding his objection to unverified financial information as to the company's performance was simply done as a shareholder/Board Member or as outlined in the terms of his Employment Agreement job description. As such, his assertion that that he was seeking legal counsel and in initiating arbitration were undertaken to protect his rights as an employee rise above a speculative level. Therefore the Ohio Public Policy exception is triggered and Neely makes a plausible showing that his termination was contrary to this policy, and that as a result, he suffered damages.  The Motion to Dismiss should be denied as to Count I.


Counts II, III, V

The Court next turns to the Motion to Dismiss on Counts II, III, and V.  As Defendants have raised these together in the Motion to Dismiss, the Court will do the same for continuity.  In his second count, Neely alleges Anticipatory Breach of Contract against Defendant Crown Solutions. (Complaint, Doc. No. 1-1, PageID 16.)  In his third count he asserts Breach of

Contract by Defendant Crown Solutions. *Id*., at PageID 18.  And in his fifth count, he raises Indemnification and Hold Harmless claims against Defendant VWS&TNA. *Id*. at PageID 19-20.

As support for his second and third claims, Neely asserts that under the Employment Agreement, which was in full force and effect on the date of his termination, Crown Solutions agreed that if Mr. Neely's employment were to be terminated for any reason, other than certain specified "no severance" conditions, and Neely had already exercised his Put Rights, then he would be entitled to receive severance pay in the amount of his base salary for a duration of six months following the date of termination.  *Id*. at PageID 16, 18. He exercised his Put Rights on October 18, 2012. *Id*. at PageID 83.  On February 13, 2013, his employment was terminated. *Id*. In his termination letter he was informed he would receive his base salary through February 15, 2013. Upon inquiry to VWS&TNA he was informed that he was not entitled to the additional severance pay or benefits as outlined in the Employment Agreement. *Id*.  Crown Solutions failed to honor its obligations and failed to make severance payments despite Neely's satisfactory performance of his obligations in the Employment Agreement. As a direct and proximate result of the anticipatory breach and breach of contract, Neely seeks monetary damages.

In his fifth count, Neely asserts that as part of the 2006 Transaction, he required VWS&TNA provide him with an indemnification obligation to ensure that the rights he bargained for in the 2006 sale of his membership interests, would in fact be obtained. (Complaint, Doc. No. 1-1, PageID 20.)  VWS&TNA must indemnify Neely and hold him harmless for refusal by Crown Solutions to pay severance due under Employment Agreement and to comply with the termination conditions. *Id*. Neely is seeking all amounts due as well for attorney fees and other out of pocket expenses involved in pursuing legal action. *Id*.

14

Defendants argue that these claims must fail as they are predicated on the existence of valid contract containing the severance condition, and the Employment Agreement in question had expired on November 22, 2009. (Motion to Dismiss, Doc. No. 2-1, PageID 141.) Under Delaware law, which governs the Employment Agreement, "when an employee's employment agreement expires but the employee continues to work for the employer, the employee is treated as an at-will employee." *Id*., *citing PPF Safeguard, LLC. v. BCR Safeguard Holding LLC*, 2010 Del. Ch. LEXIS 162 at *20 (2010); *see also* Reply, Doc. No. 12, PageID 215.

The Employment Agreement between the parties was executed on November 22, 2006. *Id*. The very terms of the agreement stated that it expired three years from the date of execution. *Id*.

> Term. The employment of Executive pursuant to the terms and conditions hereof shall continue for a period of three (3) years commencing on the Effective Date (the "Term"). Notwithstanding the foregoing, the Company may terminate Executive's employment in accordance with Section D below.

(Complaint, Doc. No. 1-1, PageID 29.) Additionally, the parties agreed that the terms of the Agreement could not be extended without consent from both parties. (Motion to Dismiss, Doc. No. 2-1, PageID 142.)

> Modification and Waiver. No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the parties hereto . . . .

(Complaint, Doc. No. 1-1, PageID 36.) At the expiration of the term of the contract, November 22, 2009, Neely continued to work, but the parties did not execute a new agreement containing the prior terms and conditions. Therefore, Neely's Employment Agreement expired and he became an at-will employee. Given this status, and the expiration of the previous agreement,

15

Crown Solutions was free to terminate his employment at any time, with or without cause, and was not required to adhere to its prior contractual agreement regarding severance. (Motion to Dismiss, Doc. No. 2-1, PageID 142.)

In fact, to survive a motion to dismiss on claim of anticipatory breach of contract and breach of contract, Neely is required to show, "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Id*. at PageID 142-143, *citing VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). By the very nature of the terms of the Employment Agreement's three-year expiration date, there was no contract in effect at the time of Neely's termination and his second and third claims fail and should be dismissed. *Id*.

Likewise, Neely fails to demonstrate a sustainable claim on his indemnification ground, as it is predicated on there having been a breach of contract. Because the contract with Crown Solutions had expired, he cannot now seek enforcement against VWS&TNA of the provisions contained in that agreement. *Id*. Furthermore, the indemnification clause contained in the agreement triggered VWS&TNA's obligation to indemnify Neely only when VWS&TNA breached its obligations, not when Crown Solution breached the terms. *Id*. at PageID 143, *citing* Complaint, Doc. No. 1-2, PageID 118. Neely does not make this allegation. Rather he alleges a breach on the part of Crown Solutions. *Id*. As it is not alleged VWS&TNA breached the terms of the contract, and even if it had been alleged or they were responsible for the actions of Crown Solutions, there was no longer a contract to breach.

Neely responds to the Motion to Dismiss by asserting that the contract was in fact in effect. He counters Defendants' argument that the Employment Agreement expired on November 22, 2009, by reiterating that both parties continued to perform their contractual

16

obligations set forth in the Employment Agreement after November 22, 2009, thus treating the agreement as fully enforceable throughout the duration of his employment with Crown Solutions. (Answer, Doc. No. 10, PageID 186.)  He also asserts that the Court should not consider one portion of the contract over another in terms of importance, but rather give effect to all language in the contract. *Id*.  By doing so, the three year terms must be read in conjunction with Section E.3(b) of the Employment Agreement which states:

> If the executive's employment is terminated (x) for Cause other than a No-Severance-Termination or (y) by the company for any reason other than a No-Severance-Termination at any time after the Executive has exercised the Put Option (as defined in the Company's Operating Agreement, dated as of the Effective Date by and among the Company Executive, VWS&TNA and Other Members (the "Operating Agreement")), then Executive will be entitled to his then current Executive Base Salary for six months following the date of Termination. . .

(Answer, Doc. No. 10, PageID 187); (Complaint, Doc. No. 1-2, PageID 104.) The Operating Agreement allowed Neely to exercise his Put Options rights "at any time until November 22, 2016." (Answer, Doc. No. 10, PageID 187.)  Therefore, the above terms must be read as to allow Mr. Neely the right to receive a specified severance payment "at any time" after he exercised the Put Option. *Id*.

Even if not expressly renewed, Neely argues that the parties, through their conduct, entered into an implied-in-fact contract based on the same terms and conditions as the previous Employment Agreement. (Answer, Doc. No. 10, PageID 189.)  He cites to cases in various circuits holding that it is "a widely accepted principle" that "when an agreement expires by its terms, if, without more, the parties continue to perform as therefore an implication arises that they have mutually assented to a new contract containing the same provisions as the old." *National Union Fire Ins. Co. v. Showa Shipping Co.*, 166 F.3d 343, n6 (9th Cir. 1999), reported

in full text at 1999 U.S. App. LEXIS 516,   (9th Cir. 1999), *quoting Martin v. Campanaro*, 156 F.2d 127, 129 (2nd Cir. 1946).  He alleges that he has set forth sufficient facts to establish that he and Crown Solutions performed as if the contract were still in effect, thus making it impliedly so. Furthermore, neither party "clearly and manifestly indicated, through words or conduct, that it no longer wished to be bound by the Agreement." *Id*.  He further notes that the parties manifested their mutual belief that the contractual relationship continued when he signed the Partial Put Payment Agreement, on December 31, 2012, in which he expressly reserved all of his rights under the Employment Agreement, which VWS&TNA signed and acknowledged. *Id*. at 190.

When interpreting a contract, the court strives to determine the parties shared intent by looking at the relevant document, read as a whole. *Metro Life Ins. Co. v. Tremont Group Holdings, Inc.*, 2012 Del. Ch. LEXIS 287 at *54 (2012).   When considering a specific contractual provision, the court should reconcile all of an agreement's provisions when read as a whole, giving effect to each and every term. *Id*. This guarantees that the contract will be "interpreted in a manner that does not render any provision 'illusory or meaningless.'" *Id*., *citing Schuss v. Penfield Partners, L.P.*, 2008 Del. Ch. LEXIS 73 (2008).

Additionally, unless otherwise defined within the contract, the court will interpret each word by using its common and ordinary meaning. When the language contained in the contract is "clear and unambiguous," the ordinary language contained therein is used to decipher the intent of the parties', however, when a contract is ambiguous, the language in the contract may be fairly susceptible to different interpretations or may have multiple meanings. *Id*. When such ambiguity exists, dismissal is only proper if the defendants' interpretation is the only reasonable construction under law. *Id*.

The Court notes that the terms of the contract are not so unclear by what they say, but rather by what they fail to say.  This issue is in and of itself the cause of the conflict now before this Court.  The section defining term of "employment of Executive pursuant to the terms and conditions here shall continue for a period of three (3) years commencing on the Effective Date. . ." fails to state how the employment or agreement converts after that three year date. (Complaint, Doc. No. 1-1, PageID 28.) Ambiguity does not exist however simply because the parties do not agree as to the interpretation of the contract. *Metro Life Ins. Co. v. Tremont Group Holdings, Inc.*, 2012 Del. Ch. LEXIS 287 at *54 (2012).

In looking at the document as a whole, the Court considers another provision, or rather Plaintiff's interpretation of another provision, contained within the Employment Agreement. Specifically, the Court turns to paragraph E(3)(b) of the Agreement and applies the common and ordinary meaning rule:

> If the executive's employment is terminated (x) for Cause other than a No-Severance-Termination or **(y) by the company for any reason other than a No-Severance-Termination at any time after the Executive has exercised the Put Option** (as defined in the Company's Operating Agreement, dated as of the Effective Date by and among the Company Executive, VWS&TNA and Other Members (the "Operating Agreement")), **then Executive will be entitled to his then current Executive Base Salary for six months following the date of Termination**. . .

(Complaint, Doc. No. 1-1, PageID 30)(emphasis added).  When reading the provisions as a whole in an attempt to determine the intent of the parties, giving effect to each term, and in applying ordinary meaning, it appears Neely has pled sufficient facts to proceed on this claim of expressly stated terms of severance pay.

The Court now turns to the question of an implied contract.  A case from the Third Circuit held that:

> Thus general principles of contract law teach us that when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact unless either one of the parties clearly and manifestly indicates, through words or through conduct, that it no longer wishes to continue to be bound thereby, or both parties mutually intend that the terms not survive. The rationale for this rule is straightforward: when parties to an ongoing, voluntary, contractual relationship, especially a relationship which by its nature generally implies that some mutually agreed upon rules govern its configuration, continue to behave as before upon the lapse of the contract, barring contrary indication, each party may generally reasonably expect that the lapsed agreement's terms remain the ones by which the other party will abide.

*Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionery & Tobacco Workers Int'l Union*, 28 F.3d 347, 355-356 (3rd Cir. 1994). While that is not a case originating from Delaware,[1] there is evidence that the State has in fact followed the implied-in-fact contract principles. *Capital Mgmt. Co. v. Brown*, for example held that "[t]he contract between Cathedral and Capital was implied-in-fact after the express written contract had expired." 813 A.2d 1094, 1097 (Del. 2002). To determine this, the court looked to the actions by the parties, "[t]he parties' intent and mutual assent to an implied-in-fact contract is proved through conduct rather than words. . ." *Id.*, *citing Chase Manhattan Bank v. Iridium Afr. Corp.*, 239 F. Supp. 2d 402, 408 (D.C. Del. 2002). The court found that after the written contract had expired, Capital's actions of keeping up the property (painting, plumbing, etc) and the Cathedral's acceptance, was sufficient to show the parties intent. *Id.* Here both parties continued in their roles after the November 22, 2009, contract "expiration." Additionally, accepting the Plaintiff's factual allegations as true, when signing the Partial Put Payment Agreement on December 31, 2012, Plaintiff expressly reserved all of his rights under the Employment Agreement, and this was both acknowledged and signed by

---

[1] See discussion on choice of law governing the Employment Agreement, *supra*.

VWS&TNA. This lends itself, to a plausible level, to a finding of a mutual belief of an implied-in-fact contract.

Thus, following the standard set forth in *Metro. Life Ins. Co. v. Tremont Group Holdings, Inc* and *VLIW Tech., LLC v. Hewlett-Packard*, and in construing the Complaint in the light most favorable to the Plaintiff, Neely succeeds in making a plausible claim as to the existence of a contract, either express or implied. *Metro. Life Ins. Co. v. Tremont Group Holdings, Inc.*, 2012 Del. Ch. LEXIS 287 (Del. Ch. 2012); *VLIW Tech., LLC v. Hewlett-Packard*, 840 A.2d 606, 612 (Del. 2003). Assuming, for the sake of the 12(b)(6) Motion, the existence of a contract, Neely could then also make a showing that there was a breach of an obligation imposed by the agreement; and damages suffered. (Answer, Doc. No. 10, PageID 186), *citing Metro. Life Ins. Co. v. Tremont Group Holdings, Inc.*, 2012 Del. Ch. LEXIS 287 (Del. Ch. 2012). It is recommended that the Motion to Dismiss on Counts II and III be denied..

As for Count V, the Magistrate Judge recommends granting Defendant's Motion to Dismiss. The Assignment Agreement, specifically defines "Buyer" as VWS North America, Inc.. (Complaint, Doc. No. 1-2, PageID 114.) Crown Solutions is referred to within the Agreement as "CSI." *Id*. It is later defined that the Buyer and its Affiliates, including Crown Solutions, as well as their representatives, would collectively be called "Buyer Indemnities." *Id*. at 118. The under the covenant provisions, specifically indemnification, the Agreement states:

> 6.2(c)(ii) "the Buyer (the "Buyer Indemnitor") shall indemnify the Members and their respective Affiliates and Representatives (the "Members Indemnitees") and shall hold each of them harmless from and against all Losses that are incurred or suffered by any of them in connection with, arising out of or resulting from**: (ii) any breach of or failure to perform any covenant or obligation the Buyer contained in this Agreement or any Ancillary Agreement**.

*Id.* at PageID 118. Therefore, according to the plain meaning of this clause, in order for VWS&TNA to indemnify the "Members," the breach would have had to have been on the part of the Buyer, VWS&TNA, itself. This Court agrees that Neely did not allege this, but rather is alleging that VWS&TNA should indemnify him for losses as a result of Crown Solutions' breach of contract. This claim should be dismissed.

Count IV

In his fourth count, Neely argues breach of the implied covenant of good faith and fair dealing against Defendant Crown Solutions. (Complaint, Doc. No. 1-1, PageID 19.) In support of this ground he states that all contracts have an implied covenant of good faith and fair dealing and that both parties, Neely and Crown Solutions, were required to act in good faith and deal fairly with one another. Crown Solutions breached the covenant of good faith and fair dealing when it terminated Neely in retaliation for exercising his right to consult an attorney, pursue arbitration after failing to reach an agreed upon settlement in the buyer put price arbitration, and for his conduct at the board meeting in January of 2013 in regards to the financial disclosure. *Id.*

Defendants move to dismiss this count because Neely fails to identify specific obligations implied in the contract. (Motion to Dismiss, Doc. No. 2, PageID 144.) Furthermore, Neely fails to identify specific provisions in the Employment Agreement that would support a finding that the parties intended to be bound by those obligations. *Id.* Defendants further allege that an implied covenant "cannot be invoked to override the express terms of the contract" and that "general allegations of bad faith conduct are not sufficient to state a claim for breach of implied covenant of good faith and fair dealing." *Metro Life Ins., Co. v. Tremont Group Holdings, Inc.*, 2010 Del. Ch. LEXIS 287 at *59-60 (2012).

In turning to Neely's assertion that Crown Solutions breached this covenant by terminating him in "retaliation" for certain actions, they counter that Neely concedes he was an at-will employee and could be terminated with or without cause at any point. (Motion to Dismiss, Doc. No. 2-1, PageID 145.)  Furthermore, Neely fails to show that the parties impliedly agreed that Crown Solutions would not terminate him for any of those actions. Therefore, Neely fails to make the required connection between the alleged violations and the specific implied obligations in the Employment Agreement. *Id*.

Finally Defendants assert that Neely fails to support his claim with specific provisions contained in the Employment Agreement which would support a finding that the parties would have agreed to such obligations had they negotiated the issue.  Rather, the terms of the Agreement expressly override that idea by addressing grounds and limits for termination. *Id*. at 145, *citing* Complaint, Doc. No. 1-2, PageID 102-103. Any changes to these terms now, through implied obligations, would be contrary to the parties' agreement at the time of entering into the contract. *Id*. at 146.

The Court turns to *Metro Life Ins., Co. v. Tremont Group Holdings, Inc.*, 2010 Del. Ch. LEXIS 287 at *59-60 (2012) which stated:

> the implied covenant of good faith and fair dealing attached to every contract by operation of law. It requires contracting parties "to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." Otherwise, "parties to a contract could undermine and frustrate every legal obligation entered into." The implied covenant acts as a way to import terms into an agreement to address unanticipated developments or to fill gaps in the contract's provisions."

2010 Del. Ch. LEXIS 287 at *59-60 (2012) (internal citations omitted).  To state a claim for breach of the implied covenant of good faith and fair dealing, the plaintiff must allege: "(1) a

specific obligation implied in the contract; (2) a breach of that obligation; and (3) resulting damages." *Id*.  A court will only imply a contractual obligation, "when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue, [and] plaintiff advance[s] provisions of the agreement that support this finding." *Id*.  The court continued by clarifying that:

> Since a court can only imply a contractual obligation when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated on the issue, the plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation.

*Id*., *quoting Fitzgerald v. Cantor*, 1998 Del. Ch. LEXIS 212, 1998 WL 842316 at *1.  In the Motion to Dismiss Defendants allege that the Complaint does not allege what specific obligations were implied by the Employment Agreement. (Motion to Dismiss, Doc. No. 2-1, PageID 144.)  He also failed to identify specific provisions which would support a finding that the parties intended to be bound by such obligations. *Id*.  Plaintiff makes no response to this allegation in his Memorandum in Opposition. The Complaint itself alleges that Defendant had an obligation to act in good faith and deal fairly and that it breached this covenant by terminating Neely.   "General allegations of bad faith conduct are not sufficient" to state a claim. *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). While his Complaint is somewhat general in terms, the following paragraph does list the actions he claimed brought about the retaliatory termination, specifically that he was terminated in retaliation for seeking legal advice, commencing arbitration proceedings, and for conduct at a Board meeting. Taking these allegations as true, and for reasons previously set forth in previous claims, Neely has made a plausible claim for breach of implied covenant of good faith and fair dealing. The Delaware

Supreme Court has set forth four primary situations in which an employer's authority to terminate employment is limited by the implied covenant of good faith and fair dealing:

> (1) Where the employee's termination violates public policy,
>
> (2) Where the employer misrepresents an important fact and the employee relies on it when deciding to accept a new position or to remain at a present one,
>
> (3) Where the employer uses its superior bargaining power to deprive an employee of identifiable compensation related to an employee's past service, and
>
> (4) Where an employer through deceit, fraud, and misrepresentation manipulates the record "to create fictitious grounds to terminate employment."

*Bailey v. City of Wilmington*, 766 A.2d 477, 480 (2001), *citing E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443-44 (1996); *see also Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 101 (1992). As the Court recommended that Neely be permitted to proceed on his claim dealing with his termination as a question of violating public policy, his breach of implied covenant falls squarely into the exception enumerated above. Taking that into consideration Neely has meet his burden in making a plausible claim for breach of implied covenant of good faith. The Motion to Dismiss on Count IV should be denied.


Count VI

In his sixth claim, Neely alleges tortious interference with contract against Defendant VWS&TNA (Complaint, Doc. No. 1-1, PageID 20.) As support he alleges that VWS&TNA was aware of the terms and conditions of the Employment Agreement between Crown Solutions and himself, but knowingly and intentionally caused Crown Solutions to breach that Agreement. *Id.* He further states that in retaliation for certain actions, VWS&TNA caused Crown Solutions to terminate him and deny his severance pay. *Id.* at 21. He alleges that this was done maliciously, spitefully, and in disregard for his legal and contractual rights and that VWS&TNA did not

undertake these actions in an effort to protect its own legitimate business or financial interests. As such, he is owed damages in an amount yet to be determined. Therefore, he argues, he has sufficiently met the requirements for bringing such an intentional interference with a contract claim: "(1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) a lack of justification; and (5) resulting damages." (Answer, Doc. No. 10, PageID 191), *quoting Kenty v. Transamerica Permium Ins. Co.*, 72 Ohio St. 3d 415, 419 (1995).

Defendants allege in the Motion to Dismiss that the claim set forth in the Complaint fails as there was no breach of contract and because a parent cannot tortiously interfere with the contract of it subsidiary. (Motion to Dismiss, Doc. No. 2-1, PageID 146-147.) They reargue their position that the Employment Agreement expired on November 22, 2009. Because it had expired, there was no underlining contract containing severance provision in which VWS&TNA could tortuously interfere. The very basis of a claim for tortious interference with a contract requires a breach of contract. *Id.* at PageID 146, *citing Acorn United States Holdings LLC v. Premark Int'l, Inc.*, 2003 Del. Super. LEXIS 499 at *24 (2003).

Furthermore, under both Ohio and Delaware law, a parent company cannot tortiously interfere with a contract of its subsidiary. *Id.*, *citing Canderm Pharacal., Ltd. v. Elder Pharmas., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988); *ITS Fin., LLC v. Advent Fin. Servs., LLC*, 823 F. Supp. 2d 772, 783-84 (S.D. Ohio 2011); *Wallace v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999). This protects a parent company from claims of tortious interference when it is acting in furtherance of a legitimate business interest it shares with its subsidiary. *Id., citing James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, 2009 Del. Ch. LEXIS 102 at *13 (2009). An example of this would be where a parent company acts to avoid a financial situation that would be

26

undesirable to itself or the subsidiary. *Id.*  Therefore, Defendants argue, this claim cannot survive as VWS&TNA is protected as it was acting in furtherance of shared interests with Crown Solutions.

The Court has previously recommended that the claims regarding the contract be permitted to proceed.  However, in considering this claim the Court recommends granting the dismissal based on Defendants' second argument, that a plaintiff cannot maintain a claim for tortious interference of a contract by a parent company who allegedly interferes with a subsidiary's business relationship.

Tortious interference has been defined as occurring when, "one who, without privilege to do so, induces another or otherwise purposely causes a third party not to enter into, or continue, a business relation with another, or perform a contract with another is liable to the other for the harm caused thereby." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988), *quoting Heheman v. E. W. Scripps Co.*, 661 F.2d 1115, 1127 (6th Cir. 1981), *quoting Juhasz v. Quik Shops, Inc.*, 55 Ohio App. 2d 51 (1977). The *Canderm* court stated that Ohio courts recognized what other courts have deemed to be a "well-established privilege" of officers and directors interference of contracts in furtherance of their own legitimate business interests.  *Id.*, *citing Int'l Mining Co., Inc. v. Allen & Co., Inc.*, 567 F. Supp. 777 (S.D. N.Y. 1983.)  By extension then, in Ohio, "one is privileged to purposely cause another not to perform a contract with a third person where he in good faith is asserting a legally protected interest of his own, which he believes will be impaired or destroyed by the performance of the contract." *Id. citing Pearse v. McDonald's Systems of Ohio, Inc.*, 47 Ohio App. 2d 20 (1975).  In order to be cognizable, a claim of tortious interference requires that an "outsider" to the business relationship interfere with the relationship. As stated in *Kirk*, the Sixth Circuit has held that

27

under Ohio law, a plaintiff cannot sue a defendant parent company for tortious interference with a subsidiary's contractual relationship, because, as the parent company, it was standing in the "subsidiary's shoes," and was not a third party. *Kirk v. Shaw*, 2010 U.S. Dist. LEXIS 31759 at *23 (N.D. Ohio 2010)  Therefore, the parent company is not an outsider, but rather because its interests are so aligned with its subsidiary, it is in effect the same entity, this claim cannot survive, as there is no third party who induced the breach.


Count VII

Next Neely alleges a claim of tortious interference with prospective economic advantage against VWS&TNA.  (Complaint, Doc. No. 1-1, PageID 21.)  He sets forth the elements as "the tort of interference with business relationships (prospective economic advantage) generally occurs when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another." (Answer, Doc. No. 10, PageID 193), *quoting Williamson v. Rexam Beverage Can Co.*, 497 F. Supp. 2d 900, 910 (S.D. Ohio 2007.)

As support for this claim Neely points to his past employment performance record as support. (Complaint, Doc. No. 1-1, PageID 22.)  He had served as President of the company for approximately 30 years and his performance was satisfactory.  His termination was without reason, as was the denial of his severance pay. *Id.*  It was common practice of Crown Solutions to provide severance compensation to any employee terminated without cause and under circumstances which did not amount to No Severance Termination. *Id.* Mr. Neely had a reasonable expectation to continue his employment, or in the event that terminated, receive Severance Policy Compensation.  VWS&TNA, aware of Neely's good performance and the

mutual desire of Neely and Crown Solutions for continuing employment, caused Neely's termination as retaliation for consulting an attorney, initiating arbitration, and speaking out at a Board meeting. Again, these wrongful acts and practices were willful and malicious, and were taken in reckless disregard for Neely's legal and contractual rights. *Id*. As a direct and proximate result of VWS&TNA's actions alleged in this claim, Neely seeks monetary damages.

Defendant moves to dismiss on the same grounds as the previous claim in that a parent cannot be held liable for interfering with the prospective contract of a subsidiary. (Motion to Dismiss, Doc. No. 2-1, PageID 148.)  In addition, Defendant claims that Neely was an at-will employee and did not have an expectation to continued employment, nor severance benefits. The express terms of the Employment Agreement, as well as Neely's own admission that he was an at-will Employee, contradict an expectation for continued employment.  The terms of the Agreement set forth that Crown Solutions could terminate Neely "without cause at any time after the first anniversary of the effective date [of the contract]." *Id*. at PageID 149, *citing* Doc. No. 1-2, PageID 103.

Additionally, Defendants argue that the portion relating to severance pay must also be dismissed. *Id*. at PageID 149.  Multiple references to this compensation within the Employee Handbook clearly state that the disbursement of payments is discretionary. *Id*. citing Doc. No. 1-2, PageID 119, 123.  Therefore, there was no reasonable expectation as it was clear that such payment was discretionary.

In turning to the analysis, the Court notes *Kirk v. Shaw*, 2010 U.S. Dist. LEXIS 31759 (N.D. Ohio 2010), a case involving wrongful termination in violation of Ohio Public Policy when an employee was fired for reporting violations of the Foreign Corrupt Practices Act. *Kirk* extended the *Canderm* tortious interference of contract "standing in the shoes" analysis to a case

that involved tortious interference with employment relations. In looking at Sixth Circuit case law, the *Kirk* court noted that the Sixth Circuit had emphasized that when the interests of a parent company and the subsidiary is closely aligned, the parent company cannot be an "outsider" to the business relationship. 2010 U.S. Dist. LEXIS 31759 at *23-24, *citing Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 801-02 (6th Cir. 2007). Or in *Canderm* terms, the parent company is "standing in [the subsidiary's] shoes." *Canderm Phamacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988). The court in *Servo Kinetics* therefore concluded that "a parent company acting for its own benefit, unlike a corporate agent acting for his or her own benefit, can never be considered a third party for the purposes of a tortious interference claim." *Kirk*, 2010 U.S. Dist. LEXIS 31759 at *23-24, *quoting Servo Kinetics, Inc*, 475 F.3d at 801, *citing Canderm Phamacal, Ltd.,* 862 F.2d at 601. The *Kirk* court, in turn, applied that analysis and held, that "under Ohio law, a plaintiff cannot state a claim for tortious interference against a parent company for interfering with business relationships, including employment relationships, of its subsidiary, because the parent company is not a third-party to its subsidiary's business relationships." *Id*. at *24. Therefore, there was no "third-party" who induced the breach so there could be no tortious interference. *Id*.

In applying this analysis to the facts before the Court, Neely cannot withstand the Motion to Dismiss on his seventh count. VWS&TNA was the parent to its subsidiary, Crown Solutions. As such, they should be considered "the same as the actual employer" or "standing in the shoes" of Crown Solutions. Thus, they are not a third party and without a third party there is no tortious interference of this employment relationship. It is recommended that the Motion to Dismiss be granted on Count VII.

Count VIII

In the Eighth Count, Neely argues for declaratory judgment against Crown Solutions. (Complaint, Doc. No. 1-1, PageID 23.)  Specifically he argues that as a direct and proximate result of the wrongful acts and practices and material breaches of the Employment Agreement as set forth in his previous counts, there is an actual and justiciable controversy between Neely and Crown Solutions concerning his obligation to comply with the restrictive covenant in articulated in section F of Employment Agreement. *Id.* He asserts that his Complaint alleges sufficient facts to state a claim for declaratory judgment.  (Answer, Doc. No. 10, PageID 195.)  He cites to *Freedom Road Found. v. Ohio Dept. of Liquor Control*, 685 N.E.2d 522 (Ohio 1997) to show the elements required to meet the standard that declaratory judgment are  1) the action is within the scope of the Declaratory Judgment Act; 2) a justiciable controversy exists between adverse parties; and 3) speedy relief is necessary to preserve rights that may otherwise be impaired. *Id*. He states that the dispute falls under the Declaratory Judgment Act as he has requested this Court render a decision regarding his rights and obligations under the Employment Agreement. (Answer, Doc. No. 10, PageID 196.) Secondly, that because Crown Solutions materially breached the Employment Agreement in their failure to provide severance compensation and yet are now trying to enforce other portions of the breached contract, a justiciable controversy between parties exists. *Id*.  And finally, as Mr. Neely is currently unemployed, did not receive any severance compensation, and he cannot seek employment from a competitor due to the non-compete provisions, he needs speedy relief on this issue. *Id*.

Defendants argue that Neely's declaratory judgment claim must fail because the non-competition section of the Employment Agreement has a survival clause in that it remains in effect for two years following employment, enforceable even in the event Crown Solutions

breached the Employment Agreement, and therefore Neely remains bound by it. (Reply, Doc. No. 12, PageID 219.)  Furthermore, the terms of the contract state that "any claim or cause of action he may have against the Company shall not constitute a defense to the enforcement by the Company of his covenants in Section F of this Agreement." *Id*., citing to Complaint, Doc. No. 1-1, PageID 35, § F (3). Defendants also point to a section in the Employment Agreement which lays forth the conditions in the event the non-compete clause is breached by the Executive. Specifically, it states that if the Executive, Neely, were to breach the non-compete obligations, he would lose any claim to severance. *Id*.

Does a justiciable controversy exist? "A real, justiciable controversy is a 'genuine dispute between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  "When assessing the enforceability of a noncompetition agreement the court must first determine whether the plaintiff had a valid contract with the defendant and, if so, whether it was breached." 2006 Del. Ch. LEXIS 105 at *11.  This Court previously determined that Neely could proceed on his claims of breach of contract.

The contract, however, shows a restriction period of a "term of Executive's employment hereunder plus a period of two (2) years following the termination of Executive's employment, for whatever reason." (Complaint, Doc. No. 1-1, PageID 33.)  Furthermore, a Survival clause at paragraph F(1)(g) states that "Executive's obligations under this Section F shall survive the termination of Executive's employment with the Company and shall thereafter be enforceable whether or not such termination is claimed or found to be wrongful or to constitute or result in a breach of any contract or of any other duty owed or claimed to be owed to Executive by the Company or any employee, agent, or contractor of the Company." *Id*. at PageID35.  Further, under Remedies:

> . . . Executive acknowledges that any claim or cause of action he may have against the Company shall not constitute a defense to the enforcement by the Company of his covenants in Section F of this Agreement (e.g., these covenants are independent of any other provision in this Agreement). Executive also acknowledges that his experience and capabilities are such that he can obtain suitable employment otherwise than in violation of the covenants in this Agreement and that the enforcement of these covenants will not prevent the earning of a livelihood nor cause undue hardship. Without limiting the foregoing, in the event of a breach by Executive of any provision of Section F of this Agreement, the Company's obligations under this Agreement shall immediately terminate, Executive shall not be entitled to any additional monetary payments or benefits. . . .

*Id*. at PageID 35-36. When interpreting a contract, the court attempts to determine the parties shared intent by looking at the relevant document, read as a whole. *Metro Life Ins. Co. v. Tremont Group Holdings, Inc.*, 2012 Del. Ch. LEXIS 287 at \*55 (2012).  Unless otherwise stated within the contract, the court will interpret each word by using its common and ordinary meaning.  Additionally, when considering a specific contractual provision, the court should reconcile *all* of an agreement's provisions when read as a whole, giving effect to each and every term. *Id*. (emphasis added.) This guarantees that the contract will be "interpreted in a manner that does not render any provision 'illusory or meaningless.'" *Id*., *citing Schuss v. Penfield Partners, L.P.*, 2008 Del. Ch. LEXIS 73 (2008). When the language contained in the contract is "clear and unambiguous" the ordinary language contained therein will decipher intent of the parties'.  When a contract is ambiguous, however, the language in the contract may be fairly susceptible to different interpretations or may have multiple meanings. *Id*. When such an ambiguity exists dismissal is only proper if the defendants' interpretation is the only reasonable construction under law. *Id*.

The Court turns to the non-compete clause and considers it as a whole. Given its ordinary and common meaning, the express agreed-upon terms of the Employment Agreement, the non-

compete clause was to survive for an agreed-upon duration of two years once the employment relationship ceased to exist for whatever reason.  Additionally, it was agreed upon by both parties that this clause would survive even in the event of a breach of contract or any duty owed.  Because there is no ambiguity in its meaning, and taken as a whole, the Court takes the above paragraphs from the Employment Agreement as a manifestation of the parties' intent.  The contract was expressly clear on these terms and the Court recommends that the Motion to Dismiss be granted on claim VIII.

**CONCLUSION**

For reasons set forth herein, the Court recommends granting Defendant's 12(b)(6) motion in part, on claims V, VI, VII, and VIII.  It recommends denying the 12(b)(6) motion on claims I, II, III, and IV.

November 15, 2013.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).