IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LUNDY L. NEELY,

        Plaintiff,

    v.

CROWN SOLUTIONS CO., LLC,
et al.,

        Defendants.

:

:

:

:

Case No. 3:13-cv-109

DISTRICT JUDGE WALTER H. RICE

MAGISTRATE JUDGE MICHAEL R. MERZ

---

DECISION AND ENTRY ADOPTING THE REPORT AND
RECOMMENDATIONS (DOC. #16) OF THE UNITED STATES
MAGISTRATE JUDGE; OVERRULING DEFENDANTS' OBJECTIONS
(DOC. #17) TO SAID JUDICIAL FILING; SUSTAINING IN PART AND
OVERRULING IN PART DEFENDANTS' MOTION TO DISMISS (DOC.
#2); DEFENDANTS' MOTION TO DISMISS IS OVERRULED WITH
RESPECT TO PLAINTIFF'S CLAIMS FOR WRONGFUL TERMINATION
IN VIOLATION OF PUBLIC POLICY (COUNT I), ANTICIPATORY
BREACH OF CONTRACT (COUNT II), BREACH OF CONTRACT
(COUNT III), AND BREACH OF THE IMPLIED COVENANT OF GOOD
FAITH AND FAIR DEALING (COUNT IV); SAID MOTION IS
SUSTAINED WITH REGARD TO ALL OTHER CLAIMS OF PLAINTIFF'S
FIRST AMENDED COMPLAINT (DOC. #23), WHICH ARE DISMISSED
WITH PREJUDICE.

---

Plaintiff Lundy L. Neely ("Plaintiff" or "Neely") filed suit against Defendants

Crown Solutions Co., LLC ("Crown"), and Veolia Water Solutions and Technologies

North America, Inc. ("Veolia") (collectively, "Defendants"), following the

termination of his employment as Crown's CEO.  Plaintiff's First Amended

Complaint (Doc. #23) alleges eight claims.  Five claims are directed only against

Defendant Crown: wrongful termination in violation of Ohio public policy (Count I); anticipatory breach of contract (Count II); breach of contract (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); and declaratory judgment under Ohio Rev. Code § 2721.01 (Count VIII).  Three claims are directed only against Defendant Veolia: indemnification (Count V); tortious interference with contract (Count VI); and tortious interference with prospective economic advantage (Count VII).  Defendants removed this case from the Court of Common Pleas of Montgomery County, Ohio, on April 10, 2013, on the basis of diversity of citizenship jurisdiction.  Doc. #1; 28 U.S.C. §§ 1441 & 1332.

Pending before the Court is Defendants' Motion to Dismiss (Doc. #2), filed on April 7, 2013, under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants seek the dismissal of the First Amended Complaint in its entirety, arguing that Plaintiff has failed to state any claim upon which relief may be granted.  Plaintiff filed a Response on May 20, 2013 (Doc. #10), and Defendants filed a Reply on June 6, 2013 (Doc. #12).

On November 15, 2013, Magistrate Judge Michael R. Merz filed a Report and Recommendations, recommending that the Court sustain Defendants' motion in part and overrule it in part.  Doc. #16.  Specifically, he recommended dismissing the claims for indemnification (Count V),  tortious interference with contract (Count VI), and tortious interference with prospective economic advantage (Count VII), which comprise all of the claims against Veolia, as well as Plaintiff's declaratory judgment claim (Count VIII) against Crown.  The Magistrate Judge

2

recommended overruling Defendants' motion as it pertains to the claims for wrongful termination in violation of Ohio public policy (Count I), anticipatory breach of contract (Count II), breach of contract (Count III), and breach of the implied covenant of good faith and fair dealing (Count IV), which are directed solely against Crown.

Defendants filed Objections to the Report and Recommendations on December 2, 2013, arguing again for the dismissal of Count I, Count II, Count III, and Count IV. Doc. #17. Plaintiff filed a Memorandum in Opposition to Defendants' Objections on December 19, 2013. Doc. #20. Plaintiff does not object to the Magistrate Judge's recommendations to dismiss Count V, Count VI, Count VII, and Count VIII. Therefore, Counts V, VI, VII, and VIII are dismissed from this litigation.

Based upon the reasoning and citations set forth in the Report and Recommendations of the Magistrate Judge, as well as upon a thorough *de novo* review of the parties' memoranda and the applicable law, the Court adopts the recommendations of the Magistrate Judge, as supplemented herein.

## I.      Wrongful Discharge in Violation of Ohio Public Policy (Count I)

Defendants argue that Count I should be dismissed because there is no clear public policy against terminating an at-will employee for the reasons that Plaintiff alleges, which include: consulting with an attorney after a dispute arose over the

calculation of the price of Plaintiff's remaining shares of Crown that Veolia was contractually obligated to purchase; initiating arbitration proceedings over said dispute; and objecting at a meeting of Crown's Board of Directors to the acceptance of certain financial statements on which the company based the disputed calculations. Doc. #2-1 at 8-11. According to Defendants, Ohio law does not have a clear public policy against terminating an employee for consulting an attorney or initiating arbitration when those actions arise out of an employee's personal interests, as opposed to his rights as an employee. *Id.*

The Magistrate Judge disagreed with Defendants, perceiving an "intertwining relationship" between Plaintiff's role as Crown's employee/CEO and his personal interests that makes it "difficult to perhaps see where one role ended and the other began." Doc. #16 at 12-13. He noted that the Employment Agreement, which describes Plaintiff's job duties as CEO, contains references to the Operating Agreement, which governed Plaintiff's shareholder interests. *Id.* He also noted that the fact that the Employment Agreement required Plaintiff, as CEO, to report to the Board of Directors and oversee Crown's financial functions:

> puts into question whether Neely's conduct at the Board meeting regarding his objection to unverified financial information as to the company's performance was simply done as a shareholder/Board Member or as outlined in the terms of his Employment Agreement job description. As such, his assertion that he was seeking legal counsel and [] initiating arbitration . . . to protect his rights as an employee rise above a speculative level. Therefore the Ohio Public Policy exception is triggered and Neely makes a plausible showing that his termination was contrary to this policy, and that as a result, he suffered damages.

4

*Id.* at 13. Thus, the Magistrate Judge recommended overruling Defendants'
motion to dismiss, as it relates to Plaintiff's claim for wrongful discharge in
violation of public policy.

Defendants object to the Magistrate Judge's recommendation and argue that
"regardless of Neely's roles, the *right* Neeley alleges he was attempting to enforce
when he was terminated was . . . not an employment right," but one associated
with his personal financial interests. Doc. #17 at 6. They assert that the "proper
focus for assessing a wrongful termination claim is the right the employee was
seeking to enforce at the time of his termination, not the employee's role," and
that "[c]learly, the dispute over the purchase price of Neely's stock was a personal
. . . interest, not an employment right." *Id.* at 7-8.

"The traditional rule in Ohio . . . is that a general or indefinite hiring is
terminable at the will of either party, for any cause, no cause or even in gross or
reckless disregard of any employee's rights, and a discharge without cause does
not give rise to an action for damages." *Collins v. Rizkana*, 652 N.E.2d 653, 656
(Ohio 1995). However, if an employer discharges an employee in contravention of
"clear public policy," the tort of wrongful discharge in violation of public policy
may provide a remedy for the terminated at-will employee. *See Painter v. Graley*,
639 N.E.2d 51, 52 (Ohio 1994) (paragraph 2 of the syllabus). There are four
elements to a common law claim for wrongful discharge in violation of public
policy: 1) the existence of a clear public policy, as embodied in a constitution,
statute, administrative regulation, or the common law; 2) the facts or

5

circumstances surrounding the plaintiff's dismissal would jeopardize that policy; 3) conduct related to the policy motivated the plaintiff's dismissal; and 4) no overriding, legitimate business justification for the termination existed. *Wiles v. Medina Auto Parts*, 773 N.E.2d 526 (Ohio 2002) (citing *Painter*, 639 N.E.2d at 57 n. 8). "The clarity and jeopardy elements . . . are issues of law for the court's determination; the causation and overriding-justification elements are questions for determination by the fact-finder." *Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 829 (Ohio 2011) (citing *Collins*, 652 N.E.2d at 658).

The clarity element requires that the plaintiff "assert and prove a clear public policy deriving from the state or federal constitutions, a statute or administrative regulation, or the common law." *Id.* (citations omitted). The public policy in question "must be plainly manifested" within such a source, and "the plaintiff must identify the specific expression of public policy." *Id.* If challenged, the plaintiff bears the "burden of articulating, by citation of its source, a specific clear public policy." *Id.* at 830.

According to Plaintiff, "Ohio has a clear public policy prohibiting termination of employees for consulting with counsel about legal rights related to disputes with their employer or companies related to their employer through common ownership (the 'Employer Related Companies'); for complaining about certification by a Board of false financial information; and/or for initiating litigation or arbitration against Employer Related Companies. This clear public policy is grounded on federal and state statutes, the Constitutions of the United States and Ohio, and the common

6

law." Doc. #23 at 10. In his Memorandum in Opposition to Defendants' Motion to Dismiss, Plaintiff specifically cites *Simonelli v. Anderson Concrete Co.*, 650 N.E.2d 488 (Ohio Ct. App. 1994), and *Chapman v. Adia Services, Inc.*, 688 N.E.2d 604 (Ohio Ct. App. 1997).

In *Simonelli*, the plaintiff was a bookkeeper who was fired after an attorney she had hired sent a letter to her employer demanding the removal of a "final disciplinary warning" from her personnel file. 650 N.E.2d at 492. After the trial court found that those facts could not support an action for wrongful discharge in violation of public policy, it entered summary judgment in favor of the employer, but the Tenth District Court of Appeals reversed. *Id.* at 490, 492. Citing a federal district court decision, but no Ohio law, the court held that "the act of firing an employee for consulting an attorney could serve as the basis for a public policy exception to the common-law employment-at-will doctrine." *Id.* at 491-92 (citing *Thompto v. Coborn's Inc.*, 871 F. Supp. 1097 (N.D. Iowa 1994)).

The *Chapman* court also held that firing an employee for consulting an attorney may violate public policy and justify a wrongful discharge claim. 688 N.E.2d 604. In *Chapman*, the plaintiff suffered serious knee injuries after falling while visiting one of her employer's largest clients. *Id.* at 606. After hiring an attorney to pursue a claim against the client, her employer constructively terminated her. *Id.* at 606-07. The plaintiff sued her employer for wrongful discharge in violation of public policy, but the trial court granted summary judgment to the employer, concluding that "when an employer terminates an

7

employee for consulting an attorney regarding the merits of a claim that affects the employer's business, Ohio public policy is not violated." *Id.* at 607.

The Ohio Court of Appeals reversed, finding that it was "able to identify at least three sources of public policy" to support the plaintiff's claim. *Id.* at 609. First, the court cited the "open courts" provision of the Ohio Constitution, which states that "[a]ll courts shall be open, and every person, for an injury done him . . . shall have [a] remedy by due course of law, and shall have justice administered without denial or delay." *Id.* (citing Ohio Const. Art. I, § 16). Second, the court cited several provisions of the Ohio Code of Professional Responsibility that encouraged citizens' access to legal services. *Id.* (citing Ethical Considerations 1-1 & 2-1 of the Ohio Code Prof'l Resp., superseded by Ohio R. Prof'l Conduct). Third, the court cited *Riverside v. Rivera*, 477 U.S. 561 (1986), a civil rights case, for the proposition that "in order for a private citizen to obtain redress, the claimant must be able to obtain adequate legal representation." *Id. Chapman* held that "it is repugnant to the public policy of this state for employers to terminate employees for exercising their right to consult a lawyer." *Id.* at 610.

Although *Simonelli* and *Chapman* broadly recognize a cause of action for an employee who is terminated for consulting an attorney, public policy may not be violated if an employee's personal interests motivate the consultation. *Popp v. Integrated Fin. Servs., Inc.*, 2005-Ohio-5367, 2005 WL 2488050 (Ohio Ct. App. Oct. 10, 2005). In *Popp*, the plaintiff was an electrical contractor who formed a company, Popp & Co., which he later sold to the defendant, a publicly held

8

electrical services company. *Id.* ¶¶ 2-3. After the sale, the plaintiff continued to serve as president of Popp & Co., first pursuant to an employment contract, and then as an at-will employee. *Id.* ¶ 4. Five years after Popp & Co. became the defendant's subsidiary, a controversy arose over a twenty year building and equipment lease that Popp & Co. had entered into with a limited liability company in which the plaintiff had a 50% ownership interest. *Id.* ¶¶ 2-4. The defendant demanded that the plaintiff terminate the lease and replace it with a shorter one, but the plaintiff refused. *Id.* ¶ 4. The plaintiff consulted an attorney, who contacted the defendant on behalf of the plaintiff and his limited liability company, stating that they had "consulted [him] with regard to their rights pursuant to that lease and any claim they may have for early termination of that lease." *Id.* ¶ 5. Ten days later, the defendant fired the plaintiff, and the plaintiff then brought a claim against the defendant for wrongful termination in violation of public policy. *Id.* ¶ 6. The trial court granted summary judgment in favor of the defendants, finding that public policy was not violated if the "employee consults an attorney to protect his own [personal] business interests against those of his employer, especially when that consultation leads to an adversarial position and the threat of litigation against his employer." *Id*.

The Twelfth District Court of Appeals agreed with the trial court. *Id.* ¶ 17. The court thoroughly examined the holdings of both *Simonelli* and *Chapman*, but ultimately found them distinguishable:

9

> We hold that there is no public policy violation when an employer
> terminates an employee for consulting and/or retaining an attorney
> with regard to the employee's own [personal] business interests.
> While the employee's consultation with the attorney in those
> situations will affect the employer's business interests, in that the
> employee's [personal] business interest will on many occasions be
> adverse to the employer, the employee is not consulting an attorney
> regarding any rights he has as an employee. Rather, the employee is
> consulting an attorney solely about his own [personal] business
> interests. We refuse to extend the public policy exception to the
> employment-at-will doctrine in those situations.

*Id.* ¶ 16.  Because the personal "business interests" of the *Popp* plaintiff are

synonymous with the income he was to receive from the lease that the defendant

wished to terminate, the court's use of that term clearly refers to the plaintiff's

personal financial and pecuniary interests.  *Id.*

The facts that Plaintiff has alleged bear some resemblance to the facts of

*Popp.*  In both cases, the plaintiff founded a successful business entity that he

later sold to the defendant.  Both Plaintiff and Popp continued to work for the

entities they founded, at first pursuant to a contract, and then on an at-will basis,

until a dispute arose over a business deal that put them in an adversarial position

with the defendants.  In *Popp*, the plaintiff stood to lose lease income if the

defendant terminated the lease with another entity he co-owned.  Similarly, if

Veolia prevails in arbitration, Plaintiff stands to lose the difference between the

parties' competing valuations of Crown's share price.  In both situations, the

plaintiff sought the advice of an attorney regarding rights created by an agreement

that consummated a business transaction: in Popp, a lease; here, the Operating

Agreement.  In *Chapman*, by contrast, the plaintiff's rights arose from the

10

negligence of a third party, the employer's client, and the *Chapman* court was concerned that terminating her employment also closed the courthouse doors to her on her negligence claim.  Here, where the parties are already engaged in arbitration to resolve their dispute, no "courthouse doors" are closed, and the policy concern of the Chapman court is not clearly at issue.

Nevertheless, as the Magistrate Judge noted, there is an "intertwining relationship" between Plaintiff's rights and duties as Crown's employee/CEO and his interests as a shareholder, not present in the *Popp* case, from which it is plausible to infer that Plaintiff was terminated for seeking counsel regarding his rights as an employee.  Doc. #16 at 12-13.  The Court construes said inference in Plaintiff's favor, as it must on a motion brought under Federal Civil Rule 12(b)(6), as Plaintiff never explicitly refers to "an employment right" in the facts he alleges.  For example, he alleges that "he was fired for consulting with counsel, seeking a fair price for his membership interest and initiating arbitration."  Doc. #23 at 2.  Plaintiff also states that "[h]is termination was done solely in response to his consultation with legal counsel; his refusal to accept the Buyer Put Price Calculation and his decision to pursue his contractual right to arbitration as a means of resolving the dispute."  *Id.* at 8-9.  Plaintiff further states that his termination "was motivated in whole or part by a desire to retaliate against him for exercising his right to consult an attorney and pursue appropriate legal proceedings against [Defendants] after rejecting the Buyer Put Price Calculation and as

11

punishment for his conduct at the January 2013 meeting of the Board." *Id.* at 11.

However, the Court emphasizes the following allegation of Plaintiff:

> At that January meeting, **Mr. Neely had objected to the Board's acceptance of unconfirmed and inaccurate financial information** about the performance of Crown Solutions which had been presented to support the erroneous Buyer Put Price Calculation position in the upcoming arbitration. Despite Mr. Neely's objections, the Board voted to approve the unverified information.

*Id.* at 9-10 (emphasis added).

Thus, the foregoing allegation makes it plausible to infer that Plaintiff was acting in accordance with his CEO responsibilities to "manage and supervise" the company's "financial functions" when he objected to the unverified financial reports that Crown's Board adopted. Those responsibilities were set forth in his Employment Agreement, and therefore arose from his employment. The Court, therefore, agrees with the Magistrate Judge's conclusion that Plaintiff has plausibly stated a claim for wrongful termination in violation of public policy, based on Crown's termination of him after consulting an attorney.

However, Plaintiff's wrongful discharge claim is not supported by his allegation that Crown terminated him for initiating arbitration proceedings over the stock price dispute. Plaintiff does not cite any clear public policy against terminating an employee after initiating arbitration proceedings, as the Ohio Supreme Court requires. *Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 829 (Ohio 2011). Furthermore, as recognized in *Popp*, courts in Ohio "have split on whether the public policy exception recognized in *Chapman* extends to employees

12

discharged for filing suit against" their employer, or a third party such as Veolia. *Popp*, 2005-Ohio-5367 ¶ 14 (comparing cases; citations omitted); *see also Taylor v. Volunteers of Am.*, 795 N.E.2d 716 (Ohio Ct. App. 2003) (declining to extend its earlier holding in *Chapman* and refusing to recognize "a clear public policy in favor of permitting an employee to file suit against his employer"). If there is no plainly manifested public policy against termination for suing one's employer, it is less clear that any public policy exists to protect an employee who initiates arbitration proceedings in a dispute over share prices with his employer's parent company. Thus, the allegation that he was terminated for initiating arbitration does not support Plaintiff's otherwise well-stated claim for wrongful discharge in violation of public policy.

In conclusion, Plaintiff's claim for wrongful discharge in violation of public policy meets the clarity element required under Ohio law. Accordingly, the Court OVERRULES Defendants' Objection to the Magistrate Judge's recommendation that the Court not dismiss Plaintiff's claim for wrongful termination in violation of public policy (Count I), ADOPTS the recommendation of the Magistrate Judge with respect to said claim, and OVERRULES Defendants' Motion to Dismiss with respect to said claim.

## II.     Anticipatory Breach of Contract (Count II), Breach of Contract (Count III)

Plaintiff's claims for anticipatory breach of contract (Count II) and breach of contract (Count III) allege that the Employment Agreement was in effect at the

13

time of his termination, and that its express terms required Crown to pay him six months of severance payment if the company terminated him after he exercised his put rights.  Doc. #23 at 11-12.  Plaintiff claims that Crown anticipatorily breached the agreement by announcing, at the time of his termination, that it would not pay him the severance.  *Id.* at 12-13.  He also alleges that Crown breached the agreement's terms by not terminating him in accordance with its provisions, including the failure to pay him severance.  *Id*.

Defendants argue that Counts II and III should be dismissed because the Employment Agreement provided for an express term of three years, which expired prior to his termination.  Doc. #2-1 at 11.  According to Defendants, after the term expired, Plaintiff became an at-will employee who was not entitled to severance pay under the severance provision of the Employment Agreement.  *Id.* at 12.  In response, Plaintiff argues that the parties had an implied-in-fact contract, based on their continuing performance after the termination date, with the same terms.  Doc. #10 at 21-23.

The Magistrate Judge first noted that the Employment Agreement contains a choice-of-law provision that requires the application of Delaware law to any dispute arising from it.  Doc. #16 at 2.  After examining language from two provisions of the Employment Agreement, the Magistrate Judge concluded that there is a plausible allegation that the severance provision was in force when Plaintiff was terminated.  Doc. #16 at 19.  He first noted that Section B, which defines the term of employment, states only that the "employment of Executive

14

pursuant to the terms and conditions here shall continue for a period of three (3) years commencing on the Effective Date," but does not describe what happens after that date. *Id.*  Second, the Magistrate Judge emphasized particular language in the severance provision which states that: "[i]f the executive's employment is terminated . . . **by the company for any reason other than a No-Severance-Termination at any time after the Executive has exercised the Put Option . . . then Executive will be entitled to his then current Executive Base Salary for six months following the date of Termination . . . "** *Id.* (quoting Doc. #1-1). Reading the foregoing provision in conjunction with Section B, the Magistrate Judge concluded that Plaintiff plausibly stated a claim that the severance pay provision was in effect after the end of the three-year Term. *Id.*

The Magistrate Judge also concluded that Plaintiff has plausibly alleged the existence of an implied-in-fact contract. *Id.* at 20-21. He based the conclusion on the following: Delaware law, which governs the parties' agreement, recognizes an implied-in-fact contract; Plaintiff's continued employment, after the defined three-year term, demonstrates continued performance by the parties; and the allegation that, several years after the purported termination of the Employment Agreement, Veolia acknowledged Plaintiff's rights under the Employment Agreement when it signed the Put Payment Agreement. *Id.*  Based on his conclusions that Plaintiff has plausibly alleged breach, both of an express, valid contract and an implied-in-fact contract, the Magistrate Judge recommended overruling Defendants' Motion to Dismiss on Counts II and III.

15

Defendants object to that recommendation. Doc. #17 at 10. They argue that the Magistrate Judge did not read the two provisions of the Employment Agreement together, but instead interpreted them as "mutually exclusive" to one another. *Id.* According to Defendants, the phrase "the employment of [Plaintiff] pursuant to the terms and conditions hereof shall continue for a period of three (3) years commencing on the Effective Date" must include the severance provision within the "terms and conditions thereof." Thus, Plaintiff's employment was subject to the terms and conditions of the Employment Agreement, including its severance provision, for just that three year term. *Id.* He was, therefore, only entitled to receive severance pay after exercising the Put Option if he did so during that three-year time period. *Id.* Defendants also argue that even if an implied-in-fact contract can be recognized based on the parties' conduct after the expiration of the three-year term, there is no basis for recognizing that it would include the severance provision of the original Employment Agreement. *Id.* at 12.

Under Delaware law, contract interpretation is a matter of law. *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. 2006). "When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. 2006). A court must interpret "clear and unambiguous terms . . . according to their ordinary and usual meaning." *Id.* The parties' intentions are discerned solely from the language of the contract, unless some ambiguity requires the consideration of parol evidence. *Id.*

16

The viability of Plaintiff's claims for anticipatory breach and breach of contract depend on the validity of the Employment Agreement on the date of his termination.  However, because Plaintiff's claim must be evaluated according to the standards under Federal Civil Rule 12(b)(6), the Court cannot accept as true Plaintiff's legal conclusion that the Employment Agreement "was in full force and effect on the date of [his] termination." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265 (1986), and stating that "on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'").  However, there are competing interpretations of the language of the Employment Agreement, leading to the parties' dispute over whether the severance provision of Section E.3.(b) could only have been valid during Section B's defined three-year Term of employment.  The ambiguity stems from the fact that, as the Magistrate Judge noted, the Employment Agreement "fails to state how the employment or agreement converts after [the] three year date" of the Term defined in Section B.  Doc. #16 at 19.

In light of that ambiguity, it is reasonable to look outside the Employment Agreement itself for evidence of the parties' intent.  "When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *Sun-Times Media Group, Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (quoting Restatement (Second) of Contracts § 202)); *see also Hall v. John S. Isaacs & Sons Farms, Inc.*, 146 A.2d 602, 611 (Del. Ch. 1958) (recognizing but

17

refusing to apply the "presumption that the remuneration of an employee hired at a fixed wage continues at the same rate after his contract expires"). Here, Plaintiff alleges that he continued to work in accordance with the terms and conditions of the Employment Agreement, even after the three year Term ended. Doc. #23 at 8. He further alleges that Crown continued to perform its obligations during the same period, and that both parties "treated the Employment Agreement as fully enforceable." *Id.* The continued performance of the parties makes it plausible to infer that the parties intended for the Term of the Employment Agreement to be renewable, in spite of the agreement's failure to expressly indicate such intent.

Plaintiff may also proceed on his breach of contract claims under a theory of implied-in-fact contract, which the Magistrate Judge found to be an alternative basis for upholding the claims. Under Delaware law, an implied-in-fact contract may arise after the expiration of a written contract that binds the parties to the same or similar terms. *Capital Mgmt. Co. v. Brown*, 813 A.2d 1094, 1097 (Del. 2001). The elements of an implied-in fact contract, including the "parties' intent and mutual assent," must be "proved through conduct rather than words." *Id.* at 1098 (quoting *Chase Manhattan Bank v. Iridium Africa Corp.*, 239 F. Supp. 2d 402, 408 (D. Del 2002)). While contract interpretation is a matter of law, the existence of an implied-in-fact contract, as well as its terms, is a question of fact. *Id.* at 1097.

The Court agrees with the Magistrate Judge that, based on Plaintiff's allegations, a reasonable jury might conclude that an implied-in-fact

contract arose when Plaintiff continued to work for Crown after the expiration of the express three-year term of the Employment Agreement. The Court also agrees with the Magistrate's interpretation of Delaware law under the *Capital Management* case, in which the Delaware Supreme Court upheld a trial court's decision to submit evidence of continued performance after the expiration of a contract to a jury, so that the jury could determine the terms of an implied-in-fact contract. 813 A.2d at 1097. If an implied-in-fact contract arose, *Capital Management* states that Plaintiff will have the burden of proving its terms to a jury, including any severance provision allegedly breached by Crown. Defendants are correct when they point out that an implied-in-fact contract does not mandate the wholesale importation of the terms of the previous agreement, such as the severance provision in question. However, under *Capital Management*, the terms of an implied-in-fact contract are questions of fact, and Plaintiff is entitled to attempt to prove their existence.

Accordingly, the Court, therefore, ADOPTS the recommendation of the Magistrate Judge with respect to said claims, and OVERRULES Defendants' Objections to the Magistrate Judge's recommendation that the Court not dismiss Plaintiff's Claims for anticipatory breach of contract (Count II) and breach of contract (Count III. The Court, therefore, OVERRULES Defendants' Motion to Dismiss with respect to said claims.

III.     **Breach of the Implied Covenant of Good Faith and Fair Dealing (Count IV)**

Plaintiff alleges a breach of the implied covenant of good faith and fair dealing against Crown, arising from his termination "in retaliation for exercising his right to consult an attorney . . . after rejecting the Buy Put Price Calculation and as punishment for his conduct at the January 2013 meeting of the Board."  Doc. #23 at 14.  Defendants argue for dismissal of this claim based on Plaintiff's failure to identify a specific contractual obligation from which the implied covenant arises, which they claim is required by Delaware law.  Doc. #2-1 at 15-16.

The Magistrate Judge recommended overruling the Motion to Dismiss with regards to said claim, because, under Delaware law, the implied covenant of good faith and fair dealing limits an employer's ability to terminate an employee if the termination violates public policy.  Doc. #16.

Defendants object to the recommendation of the Magistrate Judge, stating that Plaintiff must do more than allege wrongful conduct.  Doc. #17 at 13-14.  Their objection repeats the argument that, under Delaware law, Plaintiff's claim fails because he does not identify a specific contractual provision that implies an obligation not to terminate him for the reasons he alleges.  *Id.*

The Delaware Supreme Court has stated that "every employment contract contains an implied covenant of good faith and fair dealing," including at-will employment.  *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 830 (Del. 2005).  "The implied covenant cannot be invoked to override the express terms of the

20

contract." *Kuroda v. SPJS Holdings,* 971 A.2d 872, 888 (Del. Ch. 2009).

Because "the doctrine of at-will employment is broad . . . the implied covenant is

to be narrowly construed." *Rizzitiello*, 868 A.2d at 830-31.  Thus, there is a

"distinct and finite set of exceptions" under which a breach of the implied

covenant of good faith and fair dealing may be applied to at-will employment:

> (1) Where the termination violated public policy;
>
> (2) Where the employer misrepresented an important fact and the employee relied 'thereon either to accept a new position or remain in a present one';
>
> (3) Where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and
>
> (4) Where the employer falsified or manipulated employment records to create fictitious ground for termination.

*Dimaio v. Christiana Sch. Dist.*, No. N12C–02–131, 2012 WL 6085421 (Del.

Supr. Ct. Dec. 6, 2012) (citing *Lord v. Souder*, 748 A.2d 393, 400 (Del.2000)).

Because Plaintiff has stated a plausible claim for wrongful termination in

violation of public policy, his claim for breach of the implied covenant of good faith

and fair dealing falls under the first exception above.  The actions that Plaintiff

alleges form the basis for a breach of the implied covenant of good faith, such as

terminating him for consulting an attorney after his "conduct" at the Board of

Directors meeting, align with his wrongful discharge claim.  Furthermore, Plaintiff's

claim is not defeated by Defendants' argument that Plaintiff has failed to cite a

specific contractual provision from which the implied covenant arises.  As noted

21

above, "every employment contract contains an implied covenant of good faith and fair dealing" under Delaware law, including agreements for at-will employment. *Rizzitiello*, 868 A.2d at 830 (citing *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 101 (Del. 1992)).

Accordingly, the Court OVERRULES Defendants' objection to the Magistrate Judge's recommendation that the Court not dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing (Count IV), ADOPTS the recommendation of the Magistrate Judge with respect to said claim, and OVERRULES Defendants' Motion to Dismiss with respect to said claim.

## IV.    Conclusion

Based upon the reasoning and citations set forth by the United States Magistrate Judge in the Report and Recommendations (Doc. #16), as well as upon a thorough *de novo* review of the parties' memoranda and the applicable law, this Court ADOPTS the recommendations therein, and OVERRULES Defendants' Objections (Doc. #17) thereto.

Defendants' Motion to Dismiss (Doc. #2) is SUSTAINED IN PART and OVERRULED in part.  Said motion is OVERRULED with respect to Plaintiff's claims for wrongful termination in violation of Ohio public policy (Count I), anticipatory breach of contract (Count II), breach of contract (Count III), and breach of the implied covenant of good faith and fair dealing (Count IV).

22

Plaintiff has not objected to the Magistrate Judge's recommendations to dismiss his claims for indemnification (Count V), tortious interference with contract (Count VI), and tortious interference with prospective economic advantage (Count VII), which comprise all of the claims against Veolia, or the declaratory judgment claim (Count VIII) against Crown.  Accordingly, the Court accepts the recommendation of the Magistrate Judge and DISMISSES WITH PREJUDICE said claims.

Date: March 18, 2014

WALTER H. RICE
UNITED STATES DISTRICT JUDGE